NOT DESIGNATED FOR PUBLICATION

No. 128,125

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.M., a Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Submitted without oral argument. Opinion filed April 4, 2025. Affirmed.

*Jordan E. Kieffer*, of Jordan Kieffer, P.A., of Bel Aire, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ATCHESON, P.J., COBLE and PICKERING, JJ.

PER CURIAM: D.M., the natural father (Father) of A.M., appeals the Sedgwick County District Court's termination of his parental rights. Father contends that the State failed to provide clear and convincing evidence of his current and future unfitness, even considering the presumption of unfitness that attached to him because of prior cases involving termination of his parental rights to other children. But the district court found the record devoid of any meaningful contact between Father and the child due to the lack of effort by Father, complicated by his criminal history, substance abuse, and repeated and present incarceration, and found it in the best interests of A.M. to have permanency, given that she had been in State custody for over one-and-a-half years—all except six weeks of her life. Given the evidence presented, we find the district court's conclusions supported and affirm the termination order.

FACTUAL AND PROCEDURAL BACKGROUND

Cases involving the termination of parental rights are necessarily fact driven, so we must set forth the factual background in some detail. Based on reports of drug use, homelessness, and mental health issues concerning A.M.'s natural mother (Mother), A.M. entered state protective custody on January 3, 2022, about six weeks after her birth. At the time, Father was sporadically involved in A.M.'s life, but apparently not providing for her in a physical or financial sense. Father's mother, the child's paternal grandmother, reported to a Kansas Department for Children and Families (DCF) worker that Father had nowhere to live before going to jail shortly after A.M.'s birth. Although Father would later testify at a termination hearing to explain his absence that he did not know A.M. was his child and that Mother kept him away from the baby, he told a child protection services officer in December 2021 that Mother and A.M. visited him at the county jail every day following her birth. He was listed on the baby's birth certificate and presumed to be her father, and had met with hospital officials after the baby's birth to work out a safe family discharge plan after the hospital learned the family had no home to release to. Although Father was initially on work release when A.M. entered State custody, and later posted bond following probation violations, he was not involved in this case until after A.M. was taken into custody.

In the State's petition claiming A.M. was a child in need of care (CINC), it alleged Father was not capable of providing a safe and stable living environment because of his present incarceration, his history of substance abuse, and his inability to demonstrate good insight and judgment. DCF records showed that Father previously had two children enter State custody and his parental rights to those children had ultimately been terminated in 2014 and 2015.

At the temporary custody hearing, Father appeared only by counsel. The district court held a CINC adjudication and disposition hearing about a month later, for which

2

neither parent appeared, each were found to be in default, and A.M. was adjudicated as a child in need of care. The district court ordered genetic testing to legally determine the paternity of the child. The court ultimately found reintegration was not a viable case plan objective and ordered the State to file a motion for termination of parental rights. Father was arrested the next day for fleeing or attempting to elude law enforcement but was later released on bond.

The State filed a motion for a finding of unfitness and termination of parental rights several weeks later. Although Father was listed on A.M.'s birth certificate and he had been participating in the case as the alleged father, his paternity was established through court-ordered genetic testing about a month after the CINC adjudication. Mother's parental rights were later terminated, and her rights are not at issue in this appeal.

Father contacted a Saint Francis Ministries (SFM) caseworker in May 2022—four months after the child was taken into custody—and began having supervised visits with A.M. in June 2022. Father claimed he did not have earlier contact with DCF because he was attempting to avoid arrest. Although he said he continued to have doubts about his paternity, he met with social workers regarding the case plan tasks, provided contact information to them, and SFM explained its expectations. Father testified to having four to six visits with the child. Notes from Sarah Combs, a permanency specialist for SFM, revealed only three visits, but the number was not clarified during her testimony. All parties indicated that Father's behavior during those visits was appropriate.

During this same month, Father attended several parenting classes and a class on budgeting and nutrition. Father testified that he also completed a Substance Abuse Center of Kansas evaluation and obtained treatment twice a week by Zoom through Recovery Unlimited, but DCF never received the records of the substance evaluation or treatment. Father claimed he took three urinalyses per week and passed each one. Father testified

3

that he signed a release for SFM to have access to those records. No release appears in the appellate record.

The district court held a permanency hearing during May 2022 which continued to find reintegration was not a viable goal for A.M. Again, Father appeared not in person but only through his attorney. And despite his efforts in June 2022, Father was only able to work the case plan for one month before he was incarcerated again on arrest warrants for fleeing or attempting to elude law enforcement. The appellate record reflects three different criminal cases for Father originating from offenses he committed in 2022: (1) case No. 22-CR-604, a flee/attempt to elude and driving while suspended case occurring on February 9, 2022; (2) case No. 22-CR-789, a flee/attempt to elude case in a stolen vehicle occurring on February 12, 2022; and (3) case No. 22-CR-904, a flee/elude, theft, and criminal damage to property case occurring on June 20, 2022. Father remained in prison from approximately June 20, 2022, throughout the remainder of this case.

Before his June 2022 incarceration, Father was employed part-time at Nduction Racing, making approximately $1,200 per month. Father lived with A.M.'s mother, splitting the bills and paying $435 per month in rent. When this relationship deteriorated, Father moved back to his mother's house. Father testified that A.M. could have her own bedroom at his mother's house, and he believed his mother's house was an appropriate placement for A.M.

When Father proposed his mother's home as a kinship placement for A.M., SFM conducted a walk-through of the home for visitation purposes and determined the house was suitable, but the paternal grandmother did not complete other requirements for consideration as a kinship placement. Paternal grandmother presented inconsistent interest. Initially, she wanted to care for A.M., then she became offended by something the district court judge said at a hearing and removed herself from consideration, later sought placement consideration again, only to put it off as she dealt with separation from

4

her husband. Even when the paternal grandmother expressed a desire to be reconsidered for placement, she indicated doubts about her financial and physical ability to care for A.M. without assistance. For these reasons, SFM did not consider the paternal grandmother a stable placement alternative.

The district court held its first hearing on Father's parental rights on February 22, 2023, exactly one year from the date the State had filed its termination of parental rights (TPR) motion. At that hearing, the court heard testimony from Father and Combs. Since being incarcerated, Father received no visits from any caseworker. While Combs claimed to have written some letters to Father, she conceded that one letter was returned. When Father reached out to her before his incarceration regarding his case plan tasks and his progress, Combs interacted with him, but she did not initiate any contact with him after he went to prison, aside from the letters. Combs testified that she had contact with paternal grandmother, and she believed that Father knew her name and knew how to reach her, but he made no effort to contact her since his incarceration. Combs believed that Father's transfers within the correctional system may have hindered communication.

Based on Combs' admission that SFM could have done more to assist Father in reintegrating with A.M., the court granted Father's oral motion to dismiss the termination proceeding. The court, however, maintained the CINC proceeding and kept A.M. in out-of-home placement.

The State filed a second TPR motion of Father's parental rights in August 2023. It alleged that Father was unfit because (1) the use of intoxicating liquors or narcotics or dangerous drugs of such duration or nature rendered him unable to care for the ongoing physical, mental, or emotional needs of A.M. (K.S.A. 38-2269[b][3]); (2) he committed physical, mental, or emotional abuse or neglect or sexual abuse of A.M. (K.S.A. 38-2269[b][4]); (3) he had been convicted of a felony and had been imprisoned (K.S.A. 38-2269[b][5]); (4) reasonable efforts by SFM had failed to rehabilitate the family (K.S.A.

5

38-2269[b][7]); (5) Father had exhibited a lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of A.M. (K.S.A. 38-2269[b][8]); (6) he failed to maintain regular visitation, contact, or communication with A.M. or the custodian of A.M. (K.S.A. 38-2269[c][2]); and (7) he failed to carry out a reasonable plan approved by the court directed toward the reintegration of A.M. into a parental home (K.S.A. 38-2269[c][3]). The State also alleged that Father was subject to a statutory presumption of unfitness due to losing his parental rights to two other children (K.S.A. 38-2271[a][1] and [a][3]).

A few days after the filing of the second TPR motion, the court held an evidentiary hearing, denying Father's request for a continuance. The district court heard testimony from Father, Combs, and Wendy Wentworth, a reintegration supervisor at SFM, and considered the submitted documentary evidence. Father testified that since the last hearing, he had regularly reached out to Combs. Father's testimony and Combs' testimony conflicted regarding the subject matter of those contacts, with Father suggesting that he asked Combs to arrange visits with A.M., and Combs relaying that Father kept her updated on his location, how to contact him, and that he wished to contact his lawyer. Combs testified that Father never requested a visit with A.M. at the prison, and that although Father could have attended case plan meetings by phone and he had received invitations, he never attended a case plan. Despite the differing characterizations of the contact, Father and Combs agreed the two had been in regular contact since the first termination hearing.

Wentworth testified briefly that her recommendation was to proceed with the termination of Father's parental rights because his earliest possible release from prison would be in 2025, and the court must consider this case from the perspective of child time. Although Father believed he could be released in December 2024, that was only if he completed a substance abuse program, which he had not yet enrolled in. Wentworth

6

also emphasized that Father's motivation for the substance abuse program was to seek early release from prison.

At the conclusion of the hearing, the court terminated Father's parental rights, relying in part on the presumption of unfitness arising from Father's previous CINC and termination cases and the lack of evidence demonstrating a meaningful change in his behavior since those cases. The district court took judicial notice of Father's four most recent criminal cases (2022-CR-904, 2022-CR-604, 2022-CR-789, 19-CR-3590), and noted that although substance abuse was one of the initial issues raised in the present CINC petition, Father had yet to complete, or certify his completion, of substance abuse treatment. Based on Father's history of substance abuse issues and his failure to address it in this case, the district court found that Father was unfit for the foreseeable future, based on his lack of secondary changes since his earlier termination of parental rights cases, in which substance abuse and criminal activity were the primary concerns.

The district court went on to consider it was not in A.M.'s best interests to remain in State custody until Father's release from jail, considering "child time" and A.M.'s need for permanency, and found the record was also "absent of any contact on the father's part with the minor child." The court went on to adopt the State's requested findings under K.S.A. 38-2269(b), (c), and (g) as set out in its TPR motion, and granted the State's motion for termination of Father's parental rights. The district court subsequently filed its journal entry in which it concluded Father was unfit for each of the statutory reasons alleged in the State's TPR motion. The court later filed an Order Nunc Pro Tunc to add a finding regarding the statutory presumption of unfitness under K.S.A. 38-2271(a)(1).

Father timely appealed the district court's judgment.

7

Father divides his argument into two issues on appeal. In his first argument, he claims the record lacks clear and convincing evidence to support the district court's termination order, finding he was unfit for the foreseeable future or that the termination of his rights was in A.M.'s best interests. He primarily focuses on the factors of unfitness utilized by the district court under K.S.A. 38-2269(b) and (c). His second argument simply asserts that he overcame the presumption of unfitness imposed because of his prior termination proceedings, but he does not challenge the district court's decision to apply the presumption under K.S.A. 38-2271(a)(1). Because we can and do affirm the district court's decision based on some statutory grounds for unfitness in K.S.A. 38-2269(b) and (c), we have no need to review the presumptions of unfitness under K.S.A. 38-2271(a)(1), an often difficult and legally fraught endeavor.

*Legal Principles Applicable in Parental Termination Cases*

Parents who have undertaken their responsibilities to raise children have a constitutional right under the federal and state constitutions to continue to raise those children. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). To sever this right, the State must first render an adjudication that the child is in need of care as defined under K.S.A. 38-2202(d) and then must establish clear and convincing proof that the parent is "unfit by reason of conduct or condition which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change for the foreseeable future." K.S.A. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). The foreseeable future is viewed from the perspective of a child, not from the perspective of an adult. K.S.A. 38-2201(b)(4); *In re R.S.*, 50 Kan. App. 2d at 1117. From a child's perspective, a year or even a month can be

8

a considerable period of time. *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019).

Unfitness has been generally defined as """unsuitable, incompetent or not adopted for a particular use of service.""" *In re T.H.*, 60 Kan. App. 2d 536, 547, 494 P.3d 851 (2021) (quoting *In re Armentrout*, 207 Kan. 366, 371-72, 485 P.2d 183 [1971]). "A parent who neglects or refuses, when able to do so, to provide proper or necessary support or other care necessary for the child's well-being is unfit." *In re T.H.*, 60 Kan. App. 2d at 547.

When a parent challenges the sufficiency of the evidence supporting a finding of parental unfitness, an appellate court will uphold the decision only if, after reviewing the record in a light most favorable to the prevailing party, the district court's findings are supported by clear and convincing evidence. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). Stated differently, the district court's termination of parental rights will be upheld only if "the district judge's fact findings are deemed highly probable." *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010).

In evaluating the evidence, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. at 244; *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

*Statutory Factors of Unfitness*

In considering a parent's unfitness, the district court is statutorily required to consider several nonexclusive factors. K.S.A. 38-2269(b). A single factor may establish a parent's unfitness, but the presence of a factor does not automatically establish unfitness. K.S.A. 38-2269(f). In concluding that Father was unfit, here the district court relied on

seven statutory factors under K.S.A. 38-2269(b) and (c). Following the allegations within the State's motion to terminate parental rights, the district court concluded that Father was unfit because of: (1) his continued use of drugs, K.S.A. 38-2269(b)(3); (2) physical, mental, or emotional neglect of A.M., K.S.A. 38-2269(b)(4); (3) his felony conviction and imprisonment, K.S.A. 38-2269(b)(5); (4) failure of reasonable efforts to rehabilitate the family, K.S.A. 38-2269(b)(7); (5) his lack of effort to adjust his circumstances to meet A.M.'s needs, K.S.A. 38-2269(b)(8); (6) his failure to maintain regular visitation or contact, K.S.A. 38-2269(c)(2); and (7) his failure to carry out a reasonable reintegration plan, K.S.A. 38-2269(c)(3).

Rather than consider each of these seven factors individually, some of which are supported by overlapping evidence, we focus on the primary circumstances leading to Father's inability to provide for A.M., which are: the crimes he committed after A.M.'s birth, leading to his incarceration throughout most of this case, and his lack of effort to maintain contact with A.M. during his incarceration. Father's crimes and resulting incarceration cause or contribute to the other factors demonstrating parental unfitness. Accordingly, we find the collective consideration of some factors of unfitness within the context of Father's incarceration is most appropriate.

1. *K.S.A. 38-2269(b)(5)—Conviction of a Felony and Imprisonment and K.S.A. 38-2269(b)(8)—Lack of Effort to Adjust His Circumstances to Meet A.M.'s Needs*

Father does not contest the facts of his felony convictions and his imprisonment. At the time of the final termination hearing, he was incarcerated for felony convictions of fleeing or attempting to elude law enforcement. As a result, no feasible argument could be made that he was presently able to parent A.M., with all that parenting entails. See *In re A.L.E.A.*, No. 116,276, 2017 WL 2617142, at *3-4 (Kan. App. 2017) (unpublished opinion) (an incarcerated parent is presently unable to meet his or her parental obligations

of meeting the physical, mental, and emotional needs of a child). Father admitted that he was presently incapable of parenting A.M. because of his imprisonment.

But Father contends that his current unfitness due to his imprisonment is not indicative of any future unfitness. He points to the classes he has attended, his claimed abstention from using drugs or engaging in other disciplinary matters in prison, and his ability to earn work release as evidence of his growth. While laudable, these facts do not necessarily demonstrate parental fitness.

> "We also point out that parental unfitness under the Code is not fault based but, rather, turns on a parent's ability to sufficiently care for his or her child. Neither inattention nor willful misconduct is a necessary condition for a judicial finding. So a parent who tries hard yet cannot adequately care for a child is unfit within the meaning of K.S.A. 2018 Supp. 38-2269(a). See *In re A.L.E.A.*, No. 116,276, 2017 WL 2617142, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 307 Kan. 986 (2017). We have recognized that parents who love their children may, nonetheless, be unfit. See *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008); *In re A.L.E.A.*, 2017 WL 2617142, at *6. Similarly, we have found parents unfit because they cannot meet the special needs of a child with significant physical or mental impairments. See *In re P.L.*, No. 120,220, 2019 WL 2063874, at *4 (Kan. App. 2019) (unpublished opinion) (child's 'ongoing special healthcare needs' factor in finding mother unfit); *In re M.V.J.*, No. 117,401, 2017 WL 5184341, at *5 (Kan. App. 2017) (unpublished opinion) (child's need for 'highly attentive care on a daily basis without interruption or disruption' supported termination of mother's parental rights). Statutory unfitness isn't so much a standardized level of inadequacy applicable across cases as it is a particular condition grounded in the facts of a given case." *In re M.P.*, No. 119,444, 2019 WL 2398034, at *4 (Kan. App. 2019) (unpublished opinion).

Father's substance abuse problems were a significant part of his previous CINC cases and are directly tied to the district court's conclusion that he was unfit under another related factor, K.S.A. 38-2269(b)(3). Father argues that alcohol and drugs are readily available in prison, yet he has successfully abstained and suggested he would try to get

into a prison substance abuse program. Although Father claimed that he completed a substance abuse evaluation before entering prison, the record contains no information regarding that evaluation, other than his self-serving statements. Father acknowledged that he had not yet completed a substance abuse program in prison but minimized this failure by asserting that he no longer had a substance abuse problem. Yet, Father has known since before he entered prison that completion of a substance abuse program would be necessary for reintegration with A.M., and even up to the time of the termination hearing—20 months after A.M. entered State custody—he had yet to accomplish, or certify accomplishment of, this single task. See *In re P.H.*, No. 121,808, 2020 WL 3022869, at *1 (Kan. App. 2020) (unpublished opinion) (noting that parent failed to implement secondary change and failed to adjust circumstances to meet the needs of the child).

And under the facts of this case, it is difficult to separate Father's felony convictions and incarceration under K.S.A. 38-2269(b)(5) from his unwillingness to adjust his circumstances to meet A.M.'s needs under K.S.A. 38-2269(b)(8). The child was born in late 2021, and Father was a free man for at least some time after her birth, listed on her birth certificate, and present at the hospital. For all his self-serving protestations during the termination hearings regarding whether Father believed himself to be her biological father, he presented himself as her father at the time of and during the months following her birth. The record reveals an interview between Father and child protective services one month after A.M.'s birth where he indicated he saw A.M. "every day." Yet despite knowing about the mother's pregnancy, Father admitted to using drugs during a jail stay before A.M.'s birth. He was on work release the month after her birth, due to the revocation of his probation on a 2019 criminal conviction for fleeing or attempting to elude a police officer. While on probation, Father was arrested for at least one new crime. He was later arrested on the three felony cases that occurred because of his criminal actions in February and June 2022—when A.M. was roughly three and seven months old.

12

All of this demonstrated that Father was unwilling to change his behavior to ensure he could remain free and available to parent A.M.

As a direct result of his actions, Father has remained incarcerated throughout the bulk of this case. That incarceration has, in turn, directly affected his ability to form a relationship with A.M.

> "[I]ncarceration may be considered a significant negative factor, such as where it has impeded the development of a relationship between the parent and the child, where the parent has been incarcerated for the majority of the child's life and the child spent the time in the State's custody, and where the incarceration would cause further delay in the proceedings that isn't in the child's best interests." *In re M.H.*, 50 Kan. App. at 1172.

Each of the circumstances mentioned by the *M.H.* court are equally applicable here.

Very early in A.M.'s life, Father's ability to develop a connection with her was constrained by his attempts to avoid arrest and by his eventual incarceration. In fact, by his own admission, his meaningful presence in A.M.'s life was confined to a four- to six-week period in May and June 2022, when he was on bond and the child was much less than one year old. Father claims that, during his few visits, A.M. knew him and allowed him to hold her on his lap. While no testimony regarding A.M.'s psychological condition was offered at the hearings, A.M.'s age might make her receptive to Father without fully understanding his relationship to her. The limited number of visits with A.M.— somewhere around three, one-hour supervised visits—cast considerable doubt on the strength of the relational bond that developed between such a young infant and Father in such a short period. There is no evidence in the record one way or the other to establish the extent of that bond. Regardless, the commission of illegal acts was the direct cause of Father's absence from A.M.'s life and his inability to establish a significant parent-child bond from his arrest in late June 2022 onward.

13

## 2. *K.S.A. 38-2269(c)(2)—Failure to Maintain Regular Visitation or Contact*

This lack of a parent-child bond could potentially have been mitigated, at least to some degree, but was not. Father had no visits with A.M. during his incarceration, a period of over a year at the time of the second termination hearing. Perhaps this was possible, and perhaps not, given her young age. A.M. was almost two years old at the time of the second termination hearing. For nearly her entire life, except for about a month where he had supervised visits, Father had no contact with the child. While the lack of contact was not totally within Father's control, his incarceration played a significant role in their lack of relationship. But Father's complete failure to expend any effort at communication with A.M. by sending letters, cards, gifts, and the like—all of which are possible from prison—also significantly contributed to his unfitness because of his incarceration and supports the district court's finding of unfitness under K.S.A. 38-2269(c)(2) and potentially K.S.A. 38-2269(b)(4).

In *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009), we reasoned that a court should look at an incarcerated parent's attempts to contact and maintain an ongoing relationship with a child when the parent is prevented from providing customary parental care and guidance. It is questionable whether the reasoning of *S.D.* would apply to this case because Father did not have the same kind of ongoing relationship with this young infant that a parent of an older child might have before becoming incarcerated. But, to the extent the principle applies, Father has not demonstrated any attempt—let alone significant attempts—to contact A.M. or provide for her needs.

Father blames this lack of contact on the agency, SFM, who he argues failed to maintain appropriate contact with him or establish the visits with A.M. that he requested. Father argues that he sought visits with A.M. several times, but the social worker always put him off. Later in his testimony, Father admitted that he stopped requesting visits after his second request. But when asked, Combs testified that Father did not ask her to set up

14

prison visits with A.M. Again, as the appellate court, we do not make findings on the credibility of witnesses or weigh such conflicting evidence. *In re Adoption of B.B.M.*, 290 Kan. at 244. But nowhere in the record is there evidence that Father made any effort to reach out to A.M. by letter, through his mother, with gifts or monetary support, or anything of that sort. Father simply availed himself of no such opportunities.

We do not ignore that, in this case, SFM could have done better in its own communication and to promote Father's communication with the child. In fact, as noted, the first termination hearing ended because the social worker admitted the agency had not expended reasonable efforts to assist Father in reintegrating with A.M. But here, the social service agency's failings do not absolve Father's own actions. When Father initiated contact with SFM, between the first termination hearing in February 2023 and the second termination hearing in September 2023, his purpose appeared to be related to completion of case plan tasks and contact with his lawyer, not an attempt to contact his child. He did not inquire about A.M.'s welfare or request a mailing address and attempt to send her things by mail. Nothing in the record suggests that, despite the looming termination of his parental rights, he exerted the kind of effort necessary to build or maintain a relationship with A.M. that would guide a court to overlook his present inability to provide actual care for A.M. because of his incarceration.

Kansas law is clear that one factor alone may support a finding of unfitness. K.S.A. 38-2269(f). Here, we have articulated at least three to four factors demonstrating Father's unfitness which were supported by clear and convincing evidence. We continue to examine how the district court's conclusion that Father's unfitness was unlikely to change was likewise supported.

15

### 3. *K.S.A. 38-2269(a)—Conduct or Condition Is Unlikely to Change in the Foreseeable Future*

Given his anticipated date of release from incarceration, Father's present unfitness based on his prison status alone would undoubtedly delay A.M.'s permanency. At the time of the second termination hearing, his expected release date was April 2025, which was about a year and a half from the date of the termination proceeding. Although he believed he could obtain earlier release through a work release program, this release apparently depended on his completion of a substance abuse program that he had not yet begun. Combs believed that it would take at least six months after Father's release from prison to reintegrate A.M. For these reasons, A.M. would be nearly four years old, at minimum, before she would be reintegrated into Father's home, after being placed into State custody as a newborn infant. Father's actions certainly delayed A.M.'s progress toward settling into a permanent home.

In assessing the likelihood that a parent's unfitness will continue into the foreseeable future, courts are instructed to view time from the perspective of the child. K.S.A. 38-2201(b)(4) ("The code shall be liberally construed to carry out the policies of the state which are to: . . . acknowledge that the time perception of a child differs from that of an adult and to dispose of all proceedings under this code without unnecessary delay."). "Statutory 'child time' differs from adult time because for young children a month or a year reflects a greater portion of their lives than the same period would for older teens or adults, and that difference in perception typically favors prompt case disposition achieving permanency." *In re A.T.*, No. 120,211, 2019 WL 2063949, at *10 (Kan. App. 2019) (unpublished opinion) (Atcheson, J., dissenting).

Even if Father were released early from prison, and reintegration began with a six-month window, A.M. would be three-and-a-half years old before reintegration—if all went smoothly. Father testified he would be capable of finding employment and stable

housing upon his release from prison. But nothing in his history suggests he would be capable of living a crime-free life, as DCF records contained a long list of his prior criminal cases ranging from 2007 through 2022, demonstrating he rarely went more than a year or two without new criminal charges. Records from DCF also show that he moved frequently, had never obtained a stable residence, and did not previously hold employment for a lengthy period.

If DCF placed A.M. with her paternal grandmother, perhaps such a delay could be countenanced, but the paternal grandmother did not demonstrate herself to be a reliable potential placement option, so the district court was afforded no certainty in placement with a family member. As a result, at the time of the termination hearing, A.M. remained in out-of-home placement. A two-year delay for the possibility that Father might demonstrate himself capable, for the first time, of providing for A.M. is not a permissive delay from the child's perspective. And, as already stated, Father admitted that he could not show he was presently capable of providing for A.M.'s physical and emotional needs.

Under the circumstances presented by this case, the district court's finding that Father was presently unfit by reason of his incarceration and that this unfitness was unlikely to change for the foreseeable future as viewed from A.M.'s perspective is supported by clear and convincing evidence. This factor supports the court's termination of parental rights.

### 4. *K.S.A. 38-2269(g)(1)—Best Interests of A.M.*

Once a court concludes that a parent is unfit, the court must then consider whether termination of parental rights is in the best interests of the child. When considering a child's best interests, the court should place the most weight on the physical, mental, and emotional health of the child. K.S.A. 38-2269(g)(1).

"If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 38-2269(g)(1).

Because a parent's fundamental right to a relationship with a child is no longer a consideration after the court finds them unfit to parent, the burden of proof regarding a child's best interests is merely preponderance of the evidence. K.S.A. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d at 1115-16. At this dispositional stage, the district court is given broad discretion to determine the best disposition for the child or children. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. An appellate court, therefore, reviews the dispositional decision for an abuse of judicial discretion, which may encompass an erroneous legal ruling, unsupported fact findings, or otherwise unreasonable decisions. See *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017). The party claiming an abuse of discretion bears the burden of establishing such abuse. *In re K.E.*, 294 Kan. 17, 23, 272 P.3d 28 (2012); *In re P.J.*, 56 Kan. App. 2d 461, 465-66, 430 P.3d 988 (2018).

As already explained, Father has not had significant contact with A.M. throughout her life. In fact, by the date of the final termination hearing, A.M. had spent all except six weeks of her less than two years of life in State custody. While in State custody, A.M. had just three to six one-hour visits with Father while a young infant, and that was the extent of their relationship. At the dispositional stage of a termination proceeding, however, attributing fault for this lack of relationship is less important than its effect on the child. A best-interests determination does not examine fault for a child's condition. See *In re S.I.*, No. 118,597, 2018 WL 2451937, at *4 (Kan. App. 2018) (unpublished opinion); *In re A.L.E.A.*, 2017 WL 2617142, at *6. The material consideration is whether termination of parental rights would best serve the child's physical, mental, or emotional needs. K.S.A. 38-2269(g)(1). Because of the lack of visits between Father and A.M., and

18

especially due to her young age, the child likely does not have a strong emotional bond with Father.

While the child's placement is an entirely separate determination, we do look to the district court's evaluation of the entirety of the best interests evidence. There is little evidence in the record regarding A.M.'s physical and emotional health, but every court report indicated that she was adjusting well to her foster placement, which was a potential adoptive source. The placement also has custody of A.M.'s infant sibling, another of her biological mother's children, so her placement includes one of her maternal half-siblings. While Father requested placement with his own mother so that A.M. would be with family, the record contains no evidence that A.M. has a relationship with any of her older paternal half-siblings, and again, the paternal grandmother has not been viewed as a stable placement option.

A.M. is in the only home she has ever known, with what appears to be a minimal—if any—bond with Father. There is no evidence that severing the only familial relationship A.M. has known in her young life to gamble with her future is in her best interests, and thus it cannot be said to be an abuse of the district court's discretion. See *In re Price*, 7 Kan. App. 2d 477, 480, 644 P.2d 467 (1982) ("The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm."). The district court noted A.M.'s need for permanency, which is best achieved by terminating Father's parental rights and potentially allowing for adoption by a placement A.M. already knows and feels secure in.

Because we find clear and convincing evidence to support the district court's decision to terminate Father's parental rights under the statutory factors found in K.S.A. 38-2269(b)(5), (b)(8), and (c)(2) and find no legal error in that determination, we need not and do not consider the other statutory grounds, including the presumption of unfitness under K.S.A. 38-2271(a)(1), outlined in the termination order.

19

Affirmed.